Robert J. BOLAND and Charlotte S. Boland, Plaintiffs,

v.

Davis ALLEN and Loretta Allen, Defendants.

Civ. A. No. 80–HC–341.

United States District Court, D. Colorado.

Nov. 12, 1981.

Jeffrey L. Smith, Cohen, Brame & Smith, Denver, Colo., for plaintiffs.

Gary Cornwell, Vanatta & Spelts, Denver, Colo., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHILSON, Senior District Judge.

### Preliminary Statement

On August 23, 1979, plaintiffs and defendants entered into an agreement whereby plaintiffs agreed to sell to the defendants all the stock of Northern Colorado Business Products, a corporation, for $200,000.00 (later reduced to $194,200.00) payable by a promissory installment note of defendants for $48,500.00 and the balance in cash. In September 1979, the sale was closed and defendants took over the management of the corporation.

Upon failure of defendants to pay the installment due on the note on December 15, 1979, plaintiffs instituted this action on March 14, 1980, to recover judgment against defendants on the promissory note.

Defendants denied liability, alleging fraudulent and negligent misrepresentations by plaintiffs of the financial condition of the corporation and counterclaimed for recision of the transaction, compensatory and punitive damages.

Trial was had to the Court and after a consideration of the evidence and the briefs of counsel, the Court makes the following Findings of Fact.

## FINDINGS OF FACT

In the negotiations for the sale of the stock of the corporation, neither the plaintiff, Charlotte S. Boland, nor the defendant, Loretta Allen, participated and neither testified. We will refer to the plaintiffs as Boland and the defendants as Allen.

Prior to 1973, Boland had finished the second year of high school and thereafter had some schooling in business machines and electronics.

Prior to 1973, he worked for the 3–M Company overseeing business machine dealers. He left this employment in 1973 and established the business here involved in Fort Collins, Colorado. The business consisted generally of the selling and leasing of business machines and office furniture and selling supplies for business machines.

In November 1973, Boland caused the business to be incorporated under the name of the Northern Colorado Business Products, hereinafter referred to as the "corporation". Since 1974, Boland has been the sole owner of all of the stock of the corporation.

The corporate business was carried on by Boland as general manager and eight to twelve other employees.

Boland had no experience in the field of accounting and when he started the business, he employed Mr. Spillman, a certified public accountant, to prepare his financial statements and his income tax returns. The business records and books were kept by a bookkeeper employed by Boland.

In 1977, Boland decided to sell the business and listed it for sale with a real estate broker, Mr. Long, who from time to time ran advertisements in the Denver Post that the business was for sale.

At that time, Allen resided in Houston, Texas. He had received a degree in chemical engineering in 1956 and was then employed by Continental Oil Company until 1966 as a process engineer and later as Director of its new projects division which involved analysis of investments in new ventures and putting together budgets for long range plans. Eventually he became executive assistant to the president of the company and thereafter assistant to the general manager of Continental's Florida operations.

In 1969, he became executive vice-president of Metallic Building Company in Houston, Texas, and two years later became president of the company and served in that position until he resigned in 1978. As president of that company, it was Allen's duty to examine and evaluate financial statements, balance sheets, and profit and loss statements of the company.

In late 1978, Allen saw the advertisement in the Denver Post that the Boland's corporation was for sale and in April 1979, called the broker, Mr. Long, and inquired about the size of the company, the annual sales

volume, number of employees, and other matters pertaining to the corporation's activity.

In mid-May 1979, Allen made a trip to Colorado where he looked at several businesses in the state, including Northern Colorado Business Products in Fort Collins. At that time, he talked to Boland and Long and interviewed the corporation's banker.

From the information obtained from this visit, and that furnished to him by Mr. Long, Allen made cash flow projections and considered the cash flow was insufficient to justify his purchase of the corporation.

Upon his return to Houston, Allen received word from Long that Boland intended to acquire eleven additional copying machines with the intent to lease them to prospective customers. With this information, Allen's interest in the company was rekindled and he reviewed his analysis of cash flow and determined that with the additional machines, the cash flow of the corporation would be improved.

Allen returned to Fort Collins in June 1979 and again talked to the banker, Mr. Bell, showed him his new calculations, and the banker agreed that the financial condition of the company looked improved.

Allen also talked to Spillman, Boland's accountant, Boland, and Long, and requested and received additional information from which he determined that the value of the Company was less than Boland's asking price of $250,000.00.

On June 29, 1979, the parties executed a letter of intent (Exhibit A–1), to enter into a formal contract for the sale and purchase of the business for the sum of $200,000.00. Allen put in escrow, $5,000.00 as "earnest money". The sale and purchase agreement was executed August 3, 1979, providing for closing of the transaction on September 14, 1979. (Exhibit 1)

After executing the letter of intent, Allen retained Mr. Burgess, a certified public accountant with the firm of Kruchten and Company, to assist him in further investigation of the corporation and its net worth.

The investigation was extensive. Among other things, it included the following.

Allen requested Boland and his accountant, Spillman, to give Allen and Burgess free access to all the books and records of the corporation, to furnish copies of the federal income tax returns for the years 1974 to 1978, the financial statements and quarterly reports. Boland and Spillman complied with this request.

Allen questioned Boland in detail on several occasions about the corporation and its business and submitted to Boland written questions to which Boland responded.

Allen, with Boland's approval, interviewed Boland's accountant, Spillman, and officers of the First National Bank in Fort Collins, which had helped finance the operations of the corporation by loans.

Allen also made inquiry of persons in the community concerning the reputations of the corporation, Boland, and Spillman. Burgess conducted an inventory of the merchandise and equipment and examined the business machines lease agreements which produced a large part of the corporate income.

Allen interviewed representatives of Toshiba, the corporation's principal supplier.

Allen admitted at the trial that Boland and Spillman fully cooperated with him in his investigation and testified to no specific misrepresentation of any fact or facts upon which he relied in making his decision to purchase the corporate stock.

After completing his investigation, Allen and Boland, with the assistance of their respective lawyers, prepared a "Purchase Agreement" which was executed by the parties on August 3, 1979. (Exhibit 1)

Paragraph 3.3 of the contract provides: "That Sellers shall, at the request of Buyer, Buyer's attorney, Tom Metcalf, or accountant, John Burgess, furnish any financial statements, business records, copies of leases, contracts, warranties or maintenance agreements or any other business records for the inspection by said attorneys or accountants. All such requests shall be made on or before August

15, 1979, and shall be done in such a manner as not to be disruptive of the conduct of Sellers' business. The confidentiality of any customer's name reflected on any business records shall be maintained by said attorney or accountant. Buyer shall have until September 1, 1979, through its accountants and attorneys, to inspect and review said business records and to notify Sellers, in writing, of any objection that said records are inaccurate or substantially deviate from what has been represented by Sellers to Buyer as to the condition of Northern Colorado Business Products, Inc. If such written objections are given to Sellers on or before September 1, 1979, Sellers shall have until September 14, 1979, to remove or correct said objections to the satisfaction of Buyer. If such objections are so removed or corrected, this Agreement will be closed on September 14, 1979. If said objections are not removed or corrected, Buyer shall have the option to terminate this Agreement and have all monies paid down refunded forthwith or shall have the option to purchase under the terms of this Agreement taking subject to such objections. If Buyer shall fail to give Sellers such written objections by September 1, 1979, it waives its right to so object and agrees that it accepts all of such business records and the condition of the corporation as represented, with the exception of any intentional misrepresentations made in such business records."

After the execution of the contract, it was discovered that the bank had furnished Spillman with a statement of the corporation's indebtedness to the bank. This statement inadvertently understated the amount of the indebtedness. This error was discovered prior to the closing of the transaction, and the purchase agreement was amended by interlineation reducing the purchase price by the amount of the understatement of the indebtedness.

No other objections were made by Allen pursuant to paragraph 3.3 of the contract and on September 14, 1979, the transaction was closed and Allen took over the business and its management.

Paragraph 3.4 of the Purchase Agreement provides:

"That the eleven new copy machines referred to in 3.3 will, at closing, be leased for an average of a one year lease period. However, if any of such eleven machines are not leased at all upon closing, then until such machines are leased, Buyer may deduct from payments due Sellers herein, a sum equal to the monthly income upon said machines (as per the machine rental worksheet provided Buyer by Sellers) and supply income that Buyer would have received until rented. If such lost income shall exceed the monthly interest payment due Sellers, then Sellers shall pay the difference to Buyer."

In November 1979, Allen claimed that the rental of the eleven new machines mentioned in paragraph 3.4 had not been achieved. Boland disputed Allen's claim. On November 9, 1979, the dispute was settled by a written agreement (Exhibit 4), by the terms of which Allen's first installment payment on the promissory note would be due on November 15, 1979, instead of October 15, 1979, and that the interest on the promissory note would commence on October 15, 1979, instead of September 14, 1979.

Allen paid the installment on the note due November 15, 1979, and failed and refused to make further payments thereon.

The installment note provides "Non-payment of any installment when due shall cause the entire indebtedness to become due and payable at once at the option of the holder, notice of which option is hereby expressly waived." (Plaintiffs' Exhibit 3)

There is no evidence that Boland exercised this option until March 14, 1980, when the Bolands filed this action seeking to recover judgment for the principal, interest, and attorney's fees as set forth in the note.

In April 1981, more than seventeen months after the transaction was closed, Mr. Schnepel, a member of the same firm of accountants as Burgess, was employed on behalf of Allen to examine the corporate

books and records to determine the financial condition of the corporation in the summer of 1979. He made this examination during the period from April 28 to May 15, 1981.

From this examination, Schnepel concluded that the books were not kept in accordance with generally accepted accounting practices and principles.

We find no evidence that either Boland or his accountant ever expressly or impliedly represented that the books were kept in accordance with the generally accepted practices of the accounting profession.

We further find that Allen, early in his investigation, knew the books were not kept in accordance with generally accepted accounting practices. Allen specifically recognized this fact when he examined the balance sheet for June 30, 1979, and eliminated from "Current Assets" an item of "Lease Receivable—$148,130.86" the inclusion of which was admittedly not in accordance with generally accepted accounting practices.

Schnepel also testified that he did not make an audit of the books and records, but from his examination of the books, together with information obtained from Allen and Burgess, he was of the opinion that in June 1979, the corporation was bankrupt.

The weight of the evidence does not support this opinion. There is no evidence that at the time of closing the corporation had been declared bankrupt under the bankruptcy laws or that the corporation could not or did not meet its financial obligations as they became due or that the lending bank found the corporation to be insolvent. Additionally, Schnepel's opinion is in direct conflict with the conclusions drawn by Allen and his accountant, Burgess, who, after examining the same books of the corporation and after making an extensive investigation of the corporation, concluded that the financial condition of the corporation justified his purchase of the corporate stock for $200,000.00.

From the weight of the evidence, we find that the corporation was not bankrupt in June 1979, or on September 14, 1979, when the sale was closed.

In summary, we find from the evidence that neither Boland nor his accountant, Spillman, intentionally, negligently, or otherwise made any misrepresentations of existing fact upon which Allen relied in arriving at his decision to purchase the corporate stock, and the defendants are not entitled to recover on their counterclaims.

The Court finds that plaintiffs are entitled to recover from the defendants, the amount due and owing on the promissory note and that the amounts due and owing thereon are:

| | |
|---|---|
| Principal: | $48,550.00 |
| Interest from November 15, 1979, to March 14, 1980, at 10% per annum: – – | 1,618.33 |
| Interest on principal and defaulting interest ($50,168.33) from March 15, 1980, to November 12, 1981: | 9,983.50 |
| Attorneys fees as claimed in the pre-trial order: | 4,855.00 |
| TOTAL | $65,006.83 |

## CONCLUSIONS OF LAW

·Upon the facts as found by the Court, the Court concludes as a matter of law:

1. Defendants did not sustain the burden of proving by a preponderance of the evidence that plaintiffs intentionally or negligently made false misrepresentations of the financial condition of the corporation upon which defendants relied in entering into the purchase agreement, and the defendants' counterclaims against plaintiffs should be dismissed with prejudice;

2. The plaintiffs are entitled to judgment against the defendants in the amount of $65,006.83, together with plaintiffs' taxable costs.